<table>
<tr>
<td>

**DISTRICT COURT, MESA COUNTY,**
**STATE OF COLORADO**
125 N. Spruce Street
Grand Junction, CO 81501

**Plaintiffs: CALEB MARQUARDT and ASHLEY MAZZUCA**

**v.**

**Defendant: EAST COAST OH, LLC d/b/a SIMPLY 7OH**

</td>
<td>

DATE FILED
June 2, 2026 2:05 PM
FILING ID: E907E045996C1
CASE NUMBER: 2026CV30275

**▲COURT USE ONLY▲**

</td>
</tr>
<tr>
<td>

**DULIN MCQUINN YOUNG, LLP**
Francisco Martinez, #50227
4949 S. Syracuse St., Ste. 400
Denver, CO 80237
Telephone: 303-246-1111
Fax: 866-792-6396
Emails: francisco@trialproven.com;
*Attorney for Plaintiffs*

</td>
<td>

Case No.:

Division:

</td>
</tr>
<tr>
<td colspan="2" align="center">

**CIVIL CASE COVER SHEET**

</td>
</tr>
</table>

1.  This cover sheet shall be filed with the initial pleading of a complaint, counterclaim, crossclaim or third-party complaint in every district court civil (CV) case. It shall not be filed in Domestic Relations (DR), Probate (PR),, Juvenile (JA, JR, JD, JV), or Mental Health (MH) cases or in Water (CW) proceedings subject to sections 37-92-302 to 37-92-305, C.R.S. Failure to file this cover sheet is not a jurisdictional defect in the pleading but may result in a clerk's show cause order requiring its filing.

2.  Simplified Procedure under C.R.C.P. 16.1 **applies** to this case **unless** (check one box below if this party asserts that C.R.C.P. 16.1 **does not** apply):

    ☐ This is a class action, forcible entry and detainer, Rule 106, Rule 120, or other similar expedited proceeding, **or**

    ☑ This party is seeking a monetary judgment against another party of more than $100,000.00, exclusive of interest and costs, as supported by the following certification:

    > By my signature below and in compliance with C.R.C.P. 11, based upon information reasonably available to me at this time, I certify that the value of this party's claims against one of the other parties is reasonably believed to exceed $100,000.

    **Or**

**EXHIBIT A**

☐ Another party has previously filed a cover sheet stating that C.R.C.P. 16.1 does not apply to this case.

3. ☑ This party makes a **Jury Demand** at this time and pays the requisite fee. *See* C.R.C.P. 38. (Checking this box is optional.)

Date: 5-29-2026

_____
Caleb Marquardt

Date: 5/28/2026

_____
Ashley Mazzuca

Date: 5/28/2026

_____
Signature of Attorney for Party

## NOTICE

This cover sheet must be served on all other parties along with the initial pleading of a complaint, counterclaim, crossclaim, or third-party complaint.

| | |
|---|---|
| **DISTRICT COURT, MESA COUNTY, STATE OF COLORADO**<br>125 N. Spruce Street<br>Grand Junction, CO 81501 | **DATE FILED**<br>June 2, 2026 2:05 PM<br>FILING ID: E907E045996C1<br>CASE NUMBER: 2026CV30275 |
| **Plaintiffs: CALEB MARQUARDT and ASHLEY MAZZUCA**<br><br>**v.**<br><br>**Defendant: EAST COAST OH, LLC d/b/a SIMPLY 7OH** | **▲COURT USE ONLY▲** |
| **DULIN MCQUINN YOUNG, LLP**<br>Francisco Martinez, #50227<br>4949 S. Syracuse St., Ste. 400<br>Denver, CO 80237<br>Telephone: 303-246-1111<br>Fax: 866-792-6396<br>Emails: francisco@trialproven.com;<br>*Attorney for Plaintiffs* | Case No.:<br><br><br>Division: |
| **COMPLAINT AND JURY DEMAND** | |

Plaintiffs Caleb Marquardt ("Mr. Marquardt") and Ashley Mazzuca ("Ms. Mazzuca") (collectively, "Plaintiffs"), by and through undersigned counsel, Dulin McQuinn Young LLP, for their Complaint and Jury Demand against Defendant East Coast OH, LLC d/b/a Simply 7OH ("Simply 7OH" or "Defendant"), state as follows:

## INTRODUCTION

1.      This is a civil action arising from Defendant's manufacture, marketing, distribution, and sale of concentrated 7-hydroxymitragynine products marketed under the "Simply 7OH" brand.

2.      At all relevant times, Defendant marketed and promoted its products as legal, natural, and safe products intended for pain relief, mood enhancement, anxiety relief, and consumer wellness, while failing to adequately disclose the products' pharmacological potency, addictive potential, withdrawal risks, and foreseeable medical dangers.

3.      Plaintiffs reasonably relied upon Defendant's representations, omissions, and marketing practices when purchasing and consuming Defendant's products.

4.      As a direct and proximate result of Defendant's conduct, Plaintiffs developed severe physiological dependence, experienced escalating withdrawal symptoms, and suffered significant physical, neurological, psychiatric, emotional, and financial harm.

5. Ms. Mazzuca ultimately suffered a severe withdrawal-related medical emergency requiring intensive care hospitalization, intubation, sedation, and emergency intervention.

6. Mr. Marquardt suffered severe withdrawal symptoms requiring emergency treatment, medication-assisted intervention, and ongoing psychiatric and addiction-related care.

7. Defendant continued to market, distribute, and sell these products despite receiving direct notice from Mr. Marquardt concerning severe withdrawal symptoms, cardiac concerns, panic symptoms, and escalating dependency.

8. Rather than warning Plaintiffs to discontinue use or seek medical attention, Defendant continued fulfilling and encouraging purchases.

9. Plaintiffs bring this action to recover damages arising from Defendant's defective and unreasonably dangerous products, Defendant's failure to warn consumers, Defendant's negligent and deceptive conduct, and Defendant's violations of Colorado law.

## PARTIES, JURISDICTION, AND VENUE

10. Plaintiff Caleb Marquardt is a natural person and resident of Mesa County, Colorado.

11. Plaintiff Ashley Mazzuca is a natural person and resident of Mesa County, Colorado.

12. Upon information and belief, Defendant East Coast OH, LLC d/b/a Simply7OH is a foreign business entity who does business in Colorado, with its principal place of business located at 1100 University Ave. Suite 305, Rochester, New York 14607.

13. Upon information and belief, Defendant transacted business within Colorado, marketed products to Colorado consumers, sold products into Colorado, and derived substantial revenue from products sold to Colorado residents.

14. Defendant knowingly marketed, sold, and shipped the Subject Products directly to Colorado consumers, including Plaintiffs.

15. Defendant accepted payment from Plaintiffs while Plaintiffs were located in Colorado and delivered concentrated 7-hydroxymitragynine products to Plaintiffs in Colorado.

16. Defendant's products were purchased, received, consumed, and/or used by Plaintiffs in Colorado.

17. Plaintiffs suffered injuries and damages in Colorado, including emergency medical treatment, hospitalization, psychiatric care, wage loss, and other consequences in Mesa County and elsewhere in Colorado.

18.    Venue is proper in Mesa County because Plaintiffs reside in Mesa County, Plaintiffs purchased and consumed the Subject Products in Mesa County, Defendant shipped products into Mesa County, and Plaintiffs' injuries and damages occurred in Mesa County.

## BACKGROUND ON KRATOM

19.    The word "Kratom" is used to refer to both the Mitragyna Speciosa tree and various psychoactive drug products derived from the tree's leaves.

20.    The Mitragyna Speciosa tree is endemic to Southeast Asia.  Its leaves have been used in traditional medicine concoctions by indigenous people in a similar manner as coca leaves in western South America.  Much like the coca leaf, kratom leaves can also be processed to create dangerously concentrated psychoactive drug products.

21.    Kratom contains several alkaloids, of which the most widely known are mitragynine and the metabolite 7-hydroxymitragynine ("7OH").  These alkaloids act as atypical opioid antagonists, affecting the brain in a way similar to opioids like opium, heroin, and fentanyl.

22.    Kratom has been shown to cause addiction and other adverse health effects.  It is unsafe for human consumption.

23.    The FDA has not approved Kratom to treat any disease or illness.  There is no medically approved use of kratom in the United States.

24.    The FDA has issued numerous warnings against the use of products containing kratom or its psychoactive compounds and has taken action against those who illegally sell the product for pain treatment and other medical uses.[1]

25.    Since 2014, it has been illegal to import kratom for the purpose of making food.  The importers of kratom use fictitious names and/or purposes to smuggle their raw kratom through customs.

26.    Kratom sellers in the United States falsely label their drug products as food, supplements, or botanical specimens not for consumption in order to evade regulation.

27.    By sidestepping consumer protections, the kratom industry has grown dramatically in the United States. This profitable black-market industry has generated enough ill-gotten gains to fund the development of trade organizations like the American Kratom Association. It has mobilized lobbyists, a network of Kratom advocates, and industry-backed researchers to try and legitimize the ongoing profiteering of those in the Kratom business, despite their ongoing failure and refusal to comply with the clear and mandatory standards for establishing the safety and efficacy of new dietary ingredients, supplements, and drugs before they are sold to the public.

---

[1] See FDA Statement, Statement from FDA Commissioner Scott Gottlieb, M.D. on FDA advisory about deadly risks associated with Kratom (https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-fda-advisory-about-deadly-risks-associated-kratom) (last accessed May 1, 2024).

28.    With the proliferation of kratom products, U.S. consumers are paying a heavy price, including a growing number of deaths caused by kratom.

## GENERAL FACTUAL ALLEGATIONS
### Defendant's Products

29.    Defendant manufactured, marketed, distributed, and sold products containing concentrated 7-hydroxymitragynine under the "Simply 7OH" brand.

30.    Upon information and belief, Defendant was a "manufacturer" within the meaning of C.R.S. § 13-21-401 because Defendant designed, formulated, assembled, produced, prepared, labeled, packaged, marketed, distributed, and/or sold the Subject Products before sale to Plaintiffs. To the extent Defendant contends it was only a seller or distributor, Defendant had actual knowledge of the defects and risks alleged herein, exercised significant control over the product's formulation, labeling, marketing, warnings, instructions, and sale, and/or placed the products into the stream of commerce under its own brand name.

31.    7-hydroxymitragynine is a potent kratom-derived alkaloid with opioid-like properties.

32.    Upon information and belief, Defendant marketed these products through online advertising, social media, direct communications, loyalty programs, repeat-order incentives, and consumer-focused promotional materials.

33.    Defendant marketed the products as legal, natural, and safe products suitable for consumer use.

34.    Defendant failed to adequately disclose the foreseeable risks of:

a.    physiological dependence;
b.    compulsive redosing;
c.    escalating tolerance;
d.    severe withdrawal symptoms;
e.    psychiatric destabilization;
f.    cognitive impairment;
g.    delirium;
h.    agitation;
i.    respiratory compromise;
j.    hospitalization; and
k.    the need for emergency medical intervention.

35.    Defendant sold its products in concentrated tablet-sized dosing forms that foreseeably encouraged repeated dosing and escalating use.

36.    Defendant further encouraged repeat purchases through a loyalty rewards program identified as "Simply Loyalty."

4

37. Plaintiffs' order confirmations repeatedly advised Plaintiffs they were earning loyalty points through repeated purchases.

38. Defendant's marketing and sales practices encouraged frequent consumer purchasing and foreseeable repeat consumption.

### Defendant's Representations and Warranties

39. Defendant represented, expressly and impliedly, that the Subject Products were lawful, natural, safe, effective, and suitable for consumer use.

40. Defendant represented, expressly and impliedly, that the Subject Products were suitable for use by consumers seeking pain relief, mood enhancement, anxiety relief, relaxation, energy, and/or general wellness benefits.

41. Defendant's marketing, labeling, website content, ordering process, direct-to-consumer sales practices, and promotional materials communicated that the Subject Products were suitable for human consumption and ordinary consumer use.

42. Defendant's representations regarding the character, quality, safety, and uses of the Subject Products became part of the basis of the bargain between Defendant and Plaintiffs.

43. Plaintiffs purchased the Subject Products for the particular purposes promoted and encouraged by Defendant, including pain relief, mood-related benefits, anxiety relief, and consumer wellness.

44. Defendant knew or had reason to know that consumers, including Plaintiffs, were purchasing the Subject Products for those particular purposes.

45. Defendant knew or had reason to know that Plaintiffs and similarly situated consumers were relying upon Defendant's skill, judgment, marketing, product information, and superior knowledge regarding the Subject Products' safety and suitability.

46. Plaintiffs relied upon Defendant's representations, omissions, marketing, and superior knowledge when purchasing and consuming the Subject Products.

### Plaintiffs' Product Use

47. Plaintiffs first became aware of Defendant's products through Defendant's marketing and promotional materials.

48. Plaintiffs purchased Defendant's products believing them to be lawful, non-dangerous, and safer alternatives to other substances.

49. Between approximately January 2025 and June 2025, Plaintiffs purchased Defendant's products.

50.     Plaintiffs purchased approximately $5,608.46 worth of Defendant's products during that period.

51.     Defendant's order confirmations reflect repeated purchases of concentrated 30 mg and 50 mg tablet products.

52.     Over time, Plaintiffs developed tolerance to Defendant's products.

53.     As tolerance escalated, Plaintiffs were required to consume increasingly greater quantities to achieve the same effects.

54.     This escalating tolerance and compulsive redosing behavior was foreseeable.

55.     Plaintiffs' use, including repeated use and continued use to avoid withdrawal symptoms, was a reasonably expected use in light of Defendant's marketing, repeat-purchase incentives, loyalty program, dosage form, direct-to-consumer sales model, and Defendant's actual notice that consumers, including Plaintiffs, were experiencing dependency and withdrawal symptoms.

56.     Defendant knew or should have known that consumers who developed tolerance, dependence, and withdrawal symptoms would foreseeably continue using the Subject Products in escalating amounts to avoid severe physiological and psychological distress.

57.     Defendant failed to provide adequate warnings concerning tolerance escalation, dependency, withdrawal severity, or foreseeable compulsive use.

### Defendant's Notice of Harm

58.     Defendant received direct notice that Plaintiffs were experiencing severe withdrawal symptoms and dependency-related complications.

59.     On or about June 4, 2025, Mr. Marquardt informed Defendant he was experiencing "pretty tough withdrawals."

60.     On or about June 29, 2025, Mr. Marquardt directly advised Defendant that he was experiencing severe withdrawal symptoms, anxiety attacks, cardiac-related concerns, and loss of sexual function.

61.     Mr. Marquardt specifically communicated to Defendant that he feared severe health consequences if he stopped using the product.

62.     Defendant continued supplying products despite these communications.

63.     In some instances, Defendant replaced or re-shipped product at no additional cost.

64.     Upon information and belief, Defendant routinely communicated directly with consumers experiencing escalating tolerance, withdrawal symptoms, and dependency-related complaints.

6

65. Despite receiving direct reports of severe withdrawal symptoms and medical complications from consumers, including Plaintiffs, Defendant continued marketing and distributing the Subject Products without implementing additional warnings, dosage limitations, tapering guidance, or consumer safety measures.

66. Upon information and belief, Defendant prioritized continued product sales and repeat consumer purchasing over reasonable consumer safety protections.

67. Defendant's loyalty and repeat-purchase programs financially incentivized continued and escalating consumer use of concentrated 7-hydroxymitragynine products.

68. Even after receiving direct notice from Mr. Marquardt concerning escalating withdrawal symptoms, panic attacks, cardiac-related concerns, and dependency-related complications, Defendant continued fulfilling and encouraging additional purchases without warning Plaintiffs to discontinue use or seek medical treatment.

69. Defendant's conduct demonstrated conscious disregard for the safety of consumers, including Plaintiffs.

70. Defendant did not instruct Plaintiffs to discontinue use.

71. Defendant did not advise Plaintiffs to seek emergency medical care.

72. Defendant did not provide warnings concerning the severity of withdrawal.

73. Defendant did not disclose the foreseeable risks associated with escalating use.

**Ashley Mazzuca's Medical Emergency**

74. As a direct and proximate result of prolonged Simply7OH use and withdrawal, Ms. Mazzuca suffered a severe medical and psychiatric crisis.

75. On or about July 16, 2025, Ms. Mazzuca presented to Community Hospital in Grand Junction, Colorado with severe altered mental status, agitation, withdrawal symptoms, and neurological instability.

76. Treating providers documented chronic kratom use and severe withdrawal symptoms.

77. Ms. Mazzuca required intensive emergency intervention, including multiple sedatives, airway management, intubation, and intensive care treatment.

78. Treating providers documented severe agitation, delirium-like symptoms, and escalating medical instability.

79. Medical providers consulted poison control regarding Ms. Mazzuca's condition and treatment.

80.    Ms. Mazzuca required ongoing sedation and hospitalization.

81.    As a direct result of the events described herein, Ms. Mazzuca suffered severe emotional trauma, psychiatric injury, sleep disruption, cognitive symptoms, depression, anxiety, and post-traumatic symptoms.

82.    Following hospitalization, Ms. Mazzuca required ongoing psychiatric treatment.

83.    Treating providers diagnosed severe psychiatric symptoms associated with withdrawal, substance-induced injury, and ICU-related trauma.

84.    Ms. Mazzuca continues to suffer ongoing psychological, emotional, cognitive, and physical consequences.

### Caleb Marquardt's Withdrawal Injuries

85.    As a direct and proximate result of prolonged Simply7OH use and withdrawal, Mr. Marquardt suffered severe withdrawal-related injuries.

86.    On or about July 6, 2025, Mr. Marquardt presented to Delta Health in Delta, Colorado for severe kratom withdrawal symptoms.

87.    Treating providers documented that Mr. Marquardt had been consuming Simply7OH products in quantities substantially greater than the limited dosage guidance provided by Defendant.

88.    Treating providers documented severe anxiety, diaphoresis, respiratory distress symptoms, and withdrawal-related instability.

89.    Treating providers concluded that Mr. Marquardt was experiencing severe kratom withdrawal.

90.    Mr. Marquardt required emergency medical intervention and medication-assisted treatment.

91.    Following emergency treatment, Mr. Marquardt required psychiatric and addiction-related care.

92.    Treating providers documented severe withdrawal symptoms, hallucinations, cognitive impairment, insomnia, depression, anxiety, and emotional instability.

93.    Treating providers further documented escalating use patterns and severe psychological consequences associated with withdrawal.

94.    Mr. Marquardt continues to suffer ongoing psychiatric, emotional, cognitive, and physical consequences.

8

95.    Plaintiffs have incurred substantial medical expenses as a result of their use of Defendant's products.

96.    Plaintiffs have incurred psychiatric treatment expenses as a result of their use of Defendant's products.

97.    Plaintiffs have suffered loss of income, diminished earning capacity, and employment-related disruption as a result of their use of Defendant's products.

98.    Plaintiffs have suffered physical pain and suffering as a result of their use of Defendant's products.

99.    Plaintiffs have suffered emotional distress, anxiety, depression, humiliation, fear, and psychological trauma as a result of their use of Defendant's products.

100.    Plaintiffs continue to experience insomnia, cognitive symptoms, withdrawal-related symptoms, and fear of relapse as a result of their use of Defendant's products.

101.    Plaintiffs' quality of life has been substantially diminished as a result of their use of Defendant's products.

102.    Plaintiffs will continue to incur damages into the future as a result of their use of Defendant's products.

## FIRST CLAIM FOR RELIEF
### *Strict Products Liability – Defective and Unreasonably Dangerous Product*

103.    Plaintiffs incorporate the previous paragraphs as fully set forth herein.

104.    Defendant designed, manufactured, marketed, distributed, and sold the subject products.

105.    The Subject Products were expected to and did reach Plaintiffs without substantial change in their condition when they left the Defendant's hands.

106.    The Subject Products were consistently sold without any warning regarding instructions for use, the recommended dosage and known risks of the products, including the risks of abuse, overdose, and death.

107.    At the time the Subject Products were sold by the Defendant, they were in a defective condition because of their unsafe formulation, concentrated levels of 7-hydroxymitragynine and other kratom-derived alkaloids, dosage form, inadequate warnings, inadequate instructions, and failure to disclose foreseeable dependency, tolerance, withdrawal, psychiatric, neurological, and medical risks.

9

108.    At the time the Subject Products were sold by Defendant, the Subject Products were defective and unreasonably dangerous because of their design, formulation/concentration, dosage form, and inadequate warnings/instructions.

109.    At the time the Subject Products were sold by the Defendant, they were unreasonably dangerous to a person who might reasonably be expected to use, ingest or be affected by the kratom.

110.    During manufacture and before distribution, Defendant failed to take reasonable steps to reduce, limit, control, test, disclose, or warn about the pharmacologically active and dependency-producing compounds in the Subject Products, including concentrated 7-hydroxymitragynine.

111.    An ordinary consumer would reasonably conclude, as Plaintiff's did, that Defendant's Subject Products were reasonably safe when sold without warnings or instructions about the serious adverse health risks, including the risk of adverse medical consequences such as seizures and withdrawals.

112.    At the time of manufacture, the likelihood that Defendant's Subject Products would cause the serious harm inflicted on Plaintiffs rendered Defendant's lack of warnings and instructions completely inadequate.

113.    At the time and on the incident in question, Plaintiffs used Defendant's Subject Products for the very purposes for which they were intended and promoted.

114.    Without proper warnings and instructions, the Subject Products were unreasonably dangerous, unfit for their intended use, and highly dangerous and defective.

115.    Had the Subject Products been sold with appropriate warnings and instructions regarding dependency risks, escalating tolerance, withdrawal symptoms, and foreseeable medical complications, Plaintiffs would not have consumed the products in the manner alleged herein or would have sought medical intervention earlier.

116.    Defendant is strictly liable for all damages caused by the defective and unreasonably dangerous nature of the Subject Products and Defendant's failure to provide adequate warnings and instructions.

117.    As a direct and proximate result of the defective and unreasonably dangerous condition of the Subject Products, Plaintiffs suffered injuries, damages, and losses, including but not limited to physical injury, psychiatric injury, emotional distress, hospitalization, medical expenses, wage loss, diminished earning capacity, pain and suffering, and loss of enjoyment of life.

**SECOND CLAIM FOR RELIEF**
***Strict Liability – Failure to Warn***

118.    Plaintiffs incorporate the previous paragraphs as fully set forth herein.

10

119.    Defendant manufactured, marketed, distributed, advertised, labeled, promoted, and sold the Subject Products to consumers, including Plaintiffs.

120.    The Subject Products were expected to and did reach Plaintiffs without substantial change in the condition in which they were sold.

121.    At all relevant times, Defendant knew or reasonably should have known that the Subject Products created foreseeable and significant risks of physiological dependence, escalating tolerance, compulsive redosing, withdrawal symptoms, psychiatric destabilization, cognitive impairment, seizures, delirium, respiratory compromise, hospitalization, and other serious medical complications.

122.    Defendant further knew or reasonably should have known that consumers would foreseeably continue ingesting the Subject Products in escalating amounts in an effort to avoid withdrawal symptoms and maintain the products' desired effects.

123.    Despite these foreseeable risks, Defendant failed to provide adequate warnings, instructions, precautions, dosage limitations, tapering guidance, contraindications, or medical advisories concerning the Subject Products.

124.    Specifically, Defendant failed to adequately warn consumers, including Plaintiffs, regarding:

a. the addictive and dependence-producing nature of concentrated 7-hydroxymitragynine products;
b. the foreseeable development of escalating tolerance;
c. the risk of severe withdrawal symptoms upon cessation or reduction in use;
d. the foreseeable risk of compulsive redosing behavior;
e. the risk of neurological, psychiatric, respiratory, and cardiovascular complications;
f. the foreseeable need for emergency medical intervention associated with withdrawal;
g. the foreseeable risk of delirium, agitation, seizures, hallucinations, insomnia, and psychological destabilization; and
h. the need to seek immediate medical attention in the event of escalating withdrawal symptoms or dependency.

125.    The Subject Products became defective and unreasonably dangerous because adequate warnings and instructions were not provided.

126.    An ordinary consumer would not reasonably expect the Subject Products, marketed as legal, natural, and safe wellness products, to create the severe dependency, withdrawal, and medical complications experienced by Plaintiffs.

127.    The risks associated with the Subject Products were not open and obvious to ordinary consumers.

11

128.   Defendant knew or should have known that consumers would rely upon Defendant's marketing representations and omissions when deciding whether to purchase and consume the Subject Products.

129.   Plaintiffs reasonably relied upon Defendant's representations, omissions, and lack of warnings in purchasing and consuming the Subject Products.

130.   Had adequate warnings and instructions been provided, Plaintiffs would not have purchased or consumed the Subject Products or would have materially altered their use and sought medical intervention earlier.

131.   Defendant additionally had a continuing post-sale duty to warn consumers, including Plaintiffs, regarding the foreseeable risks associated with the Subject Products after Defendant became aware of escalating reports of dependency, withdrawal, and severe adverse health consequences.

132.   Defendant breached its continuing post-sale duty to warn by continuing to market, distribute, promote, and sell the Subject Products without adequate warnings despite receiving actual notice from Mr. Marquardt of severe withdrawal symptoms, anxiety attacks, cardiac-related concerns, dependency-related complications, and fear of severe health consequences if he stopped using the product.

133.   Rather than instructing Plaintiffs to discontinue use or seek emergency medical care, Defendant continued fulfilling orders and encouraging additional purchases.

134.   As a direct and proximate result of Defendant's failure to provide adequate warnings and instructions, Plaintiffs suffered injuries, damages, and losses, including but not limited to physical injury, psychiatric injury, emotional distress, hospitalization, medical expenses, wage loss, diminished earning capacity, pain and suffering, and loss of enjoyment of life.

### THIRD CLAIM FOR RELIEF
*Negligence*

135.   Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

136.   Defendant owed a duty to exercise reasonable care in the design, formulation, manufacture, testing, inspection, marketing, labeling, promotion, distribution, and sale of the Subject Products.

137.   Defendant further owed a duty to exercise reasonable care to warn foreseeable consumers, including Plaintiffs, of known or reasonably foreseeable risks associated with the Subject Products.

138.   Defendant knew or reasonably should have known that concentrated 7-hydroxymitragynine products posed foreseeable risks of addiction, escalating tolerance,

12

compulsive use, withdrawal symptoms, psychiatric injury, neurological complications, respiratory compromise, and other severe medical consequences.

139.    Defendant breached its duties of reasonable care by, among other things:

    a. designing and selling concentrated kratom-derived products without adequate safeguards;
    b. failing to adequately test the Subject Products for dependency and withdrawal risks;
    c. failing to conduct reasonable safety investigations;
    d. failing to adequately monitor adverse events and consumer complaints;
    e. marketing the Subject Products as natural, safe, and appropriate for consumer wellness use;
    f. failing to provide adequate warnings and instructions;
    g. encouraging repeat purchasing behavior through loyalty and promotional programs;
    h. failing to implement reasonable dosage limitations or consumer protections;
    i. continuing to distribute the Subject Products after receiving notice of severe withdrawal-related complications from consumers, including Mr. Marquardt; and
    j. placing defective and unreasonably dangerous products into the stream of commerce.

140.    Defendant knew or reasonably should have foreseen that consumers would use the Subject Products in escalating quantities due to tolerance, dependency, and withdrawal-related compulsive use.

141.    Defendant further knew or should have foreseen that consumers experiencing withdrawal symptoms would continue consuming the Subject Products in an effort to avoid severe physiological and psychological distress.

142.    Defendant failed to exercise the degree of care that a reasonably careful manufacturer, distributor, marketer, or seller of consumer products would have exercised under the same or similar circumstances.

143.    Defendant's conduct created an unreasonable and foreseeable risk of harm to consumers, including Plaintiffs.

144.    Plaintiffs used the Subject Products in a reasonably foreseeable manner.

145.    As a direct and proximate result of Defendant's negligence, Plaintiffs suffered injuries, damages, and losses, including but not limited to physical injury, psychiatric injury, emotional distress, hospitalization, medical expenses, wage loss, diminished earning capacity, pain and suffering, and loss of enjoyment of life.

## FOURTH CLAIM FOR RELIEF
### *Strict Products Liability – Misrepresentation*

146.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

147.    In connection with the marketing, promotion, and sale of the Subject Products, Defendant made representations to consumers, including Plaintiffs, concerning the character, quality, safety, and nature of the Subject Products.

148.    Defendant represented, expressly or impliedly, that the Subject Products were legal, natural, safe, and appropriate for consumer wellness, mood enhancement, anxiety relief, and pain management.

149.    Defendant further represented, expressly or impliedly, that the Subject Products could be safely consumed without creating severe physiological dependence, dangerous withdrawal symptoms, or serious medical complications.

150.    These representations were material.

151.    Defendant made these representations to induce consumers, including Plaintiffs, to purchase and consume the Subject Products.

152.    Defendant failed to disclose material information concerning the dependency-producing nature of the Subject Products and the foreseeable risks of escalating tolerance, compulsive use, withdrawal, psychiatric destabilization, neurological injury, hospitalization, and other severe adverse health consequences.

153.    The representations and omissions made by Defendant were false, misleading, or incomplete.

154.    Plaintiffs reasonably relied upon Defendant's representations and omissions in deciding to purchase and consume the Subject Products.

155.    Plaintiffs' reliance was foreseeable and justified.

156.    As a direct and proximate result of Defendant's misrepresentations and omissions, Plaintiffs suffered injuries, damages, and losses, including but not limited to physical injury, psychiatric injury, emotional distress, hospitalization, medical expenses, wage loss, diminished earning capacity, pain and suffering, and loss of enjoyment of life.

## FIFTH CLAIM FOR RELIEF
### *Breach of Implied Warranty of Merchantability*

157.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

158.    Defendant was a merchant engaged in the business of manufacturing, marketing, distributing, and selling the Subject Products.

14

159.    Defendant impliedly warranted that the Subject Products were merchantable and fit for the ordinary purposes for which such products were used.

160.    The Subject Products were not merchantable and were not fit for their ordinary intended purposes because they posed unreasonable and undisclosed risks of dependency, escalating tolerance, compulsive use, severe withdrawal, psychiatric destabilization, hospitalization, and other serious medical complications.

161.    The Subject Products lacked adequate warnings and instructions necessary to render the products reasonably safe for ordinary consumer use.

162.    Plaintiffs used the Subject Products in a reasonably foreseeable manner.

163.    Defendant breached the implied warranty of merchantability.

164.    Within a reasonable time after Plaintiffs discovered or should have discovered the breach, Defendant received notice of the breach, including through direct communications from Mr. Marquardt regarding severe withdrawal symptoms and dependency-related complications, pre-suit communications from Plaintiffs' counsel, and/or the filing and service of this Complaint.

165.    As a direct and proximate result of Defendant's breach of implied warranty, Plaintiffs suffered injuries, damages, and losses, including but not limited to physical injury, psychiatric injury, emotional distress, hospitalization, medical expenses, wage loss, diminished earning capacity, pain and suffering, and loss of enjoyment of life.

## SIXTH CLAIM FOR RELIEF
### *Breach of Express Warranty*

166.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

167.    Defendant made express affirmations of fact, promises, descriptions, and representations concerning the Subject Products.

168.    Defendant expressly represented that the Subject Products were lawful, natural, safe, effective, and suitable for consumer use.

169.    Defendant expressly represented that the Subject Products were suitable for consumers seeking pain relief, mood enhancement, anxiety relief, relaxation, energy, and/or general wellness benefits.

170.    Defendant expressly represented, through its marketing, labeling, website content, ordering process, direct-to-consumer sales practices, promotional materials, and repeat-purchase programs, that the Subject Products were suitable and/or fit for human consumption.

171.    Defendant's express representations, affirmations, promises, descriptions, and warranties became part of the basis of the bargain between Defendant and Plaintiffs.

172. Plaintiffs purchased and consumed the Subject Products in reliance upon Defendant's express representations, affirmations, promises, descriptions, and warranties.

173. Defendant breached its express warranties because the Subject Products were not safe, were not suitable for the represented purposes, were not fit for ordinary consumer use, and posed undisclosed risks of physiological dependence, escalating tolerance, compulsive use, severe withdrawal, psychiatric destabilization, hospitalization, and other serious medical complications.

174. The Subject Products did not conform to Defendant's express representations, affirmations, promises, descriptions, and warranties.

175. Within a reasonable time after Plaintiffs discovered or should have discovered the breach, Defendant received notice of the breach, including through direct communications from Mr. Marquardt regarding severe withdrawal symptoms and dependency-related complications, pre-suit communications from Plaintiffs' counsel, and/or the filing and service of this Complaint.

176. As a direct and proximate result of Defendant's breach of express warranty, Plaintiffs suffered injuries, damages, and losses, including but not limited to physical injury, psychiatric injury, emotional distress, hospitalization, medical expenses, wage loss, diminished earning capacity, pain and suffering, and loss of enjoyment of life.

## SEVENTH CLAIM FOR RELIEF
### *Breach of Express Warranty*

177. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

178. Defendant sold the Subject Products to Plaintiffs.

179. At the time of sale, Defendant knew or had reason to know that Plaintiffs and similarly situated consumers were purchasing the Subject Products for particular purposes promoted, encouraged, and facilitated by Defendant, including pain relief, mood enhancement, anxiety relief, relaxation, energy, and/or consumer wellness.

180. At the time of sale, Defendant knew or had reason to know that Plaintiffs and similarly situated consumers were relying upon Defendant's skill, judgment, marketing, product information, and superior knowledge to furnish products suitable for those particular purposes.

181. Defendant impliedly warranted that the Subject Products were suitable and fit for those particular purposes.

182. Plaintiffs were persons reasonably expected to use, consume, or be affected by the Subject Products.

183. Plaintiffs relied upon Defendant's skill, judgment, marketing, product information, and superior knowledge when purchasing and consuming the Subject Products.

16

184.     The Subject Products were not suitable or fit for the particular purposes for which Defendant knew they were being purchased because they posed unreasonable and undisclosed risks of physiological dependence, escalating tolerance, compulsive use, severe withdrawal, psychiatric destabilization, hospitalization, and other serious medical complications.

185.     Defendant breached the implied warranty of fitness for a particular purpose.

186.     Within a reasonable time after Plaintiffs discovered or should have discovered the breach, Defendant received notice of the breach, including through direct communications from Mr. Marquardt regarding severe withdrawal symptoms and dependency-related complications, pre-suit communications from Plaintiffs' counsel, and/or the filing and service of this Complaint.

187.     As a direct and proximate result of Defendant's breach of implied warranty of fitness for a particular purpose, Plaintiffs suffered injuries, damages, and losses, including but not limited to physical injury, psychiatric injury, emotional distress, hospitalization, medical expenses, wage loss, diminished earning capacity, pain and suffering, and loss of enjoyment of life.

## EIGHTH CLAIM FOR RELIEF
### *Violation of Colorado Consumer Protection Act C.R.S. § 6-1-101, et seq.*

188.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

189.     Defendant engaged in deceptive trade practices in the course of its business, vocation, and occupation.

190.     Defendant knowingly represented that the Subject Products possessed characteristics, ingredients, uses, benefits, and qualities that they did not possess.

191.     Defendant knowingly failed to disclose material information concerning the foreseeable risks associated with the Subject Products.

192.     Defendant marketed and promoted the Subject Products as legal, natural, safe, and suitable for wellness-related purposes while omitting material information concerning dependency, withdrawal, and severe health risks.

193.     Defendant's deceptive trade practices significantly impacted the public as actual and potential consumers of Defendant's products.

194.     Defendant's conduct was directed to the public through online marketing, social media, website-based sales, direct-to-consumer ordering systems, loyalty programs, repeat-purchase incentives, promotional materials, and product labeling.

195.     Defendant's deceptive trade practices were not limited to Plaintiffs. They involved standardized representations, omissions, marketing practices, warnings, and sales practices directed to Colorado consumers and consumers nationwide.

196.    Defendant's omissions and misrepresentations regarding dependency, withdrawal, tolerance, psychiatric destabilization, hospitalization, and severe medical risks had the capacity to deceive a significant segment of the consuming public.

197.    Plaintiffs relied upon Defendant's deceptive trade practices in purchasing and consuming the Subject Products.

198.    Defendant's deceptive trade practices caused Plaintiffs to suffer actual injuries and damages.

199.    As a direct and proximate result of Defendant's violations of the Colorado Consumer Protection Act, Plaintiffs suffered injuries, damages, and losses, including but not limited to physical injury, psychiatric injury, emotional distress, hospitalization, medical expenses, wage loss, diminished earning capacity, pain and suffering, and loss of enjoyment of life.

**WHEREFORE**, Plaintiffs respectfully request judgment against Defendant for all economic and non-economic damages allowed by law, past and future, including but not limited to medical expenses, psychiatric treatment expenses, lost income, loss of earning capacity, pain and suffering, emotional distress, inconvenience, impairment of quality of life, fear, anxiety, psychological injury, and loss of enjoyment of life. Plaintiffs further request all statutory remedies available under the Colorado Consumer Protection Act, including treble damages, attorney fees, and costs to the extent permitted by law. Plaintiffs further request pre-judgment interest, post-judgment interest, costs, attorney fees where permitted by law, and such other and further relief as the Court deems just and proper.

**PLAINTIFFS REQUEST A JURY OF SIX TO HEAR ALL ISSUES IN THIS CASE**

Respectfully submitted the 2nd day of June, 2026.

**DULIN MCQUINN YOUNG, LLP**

*/s/ Francisco Martinez*
Francisco Martinez, #50227
*Attorneys for Plaintiff*
*This document was filed electronically pursuant to Rule 121 § 1-26(7). The original signed document is on file in counsel's office.*

Plaintiffs' Address:
c/o Dulin McQuinn Young, LLP
4949 S. Syracuse Street, Suite 400
Denver, CO 80237